763 F.2d 633
 1986 A.M.C. 283
 MARE SCHIFFAHRTSKONTOR GmbH & CO., KG, Appellant,
v.
M/V OCEANHAVEN, its engines, boilers, tackle, etc.; M/V
Franco Express (formerly M/V Namrata), its engines, boilers,
tackle, etc.; M/V Sherbo, its engines, boilers, tackle,
etc.; Societe Navale Chargeurs Delmasvieljeux; Guinea Gulf
Line, Ltd.; Franco Express Lines, S.A.; Franco Compania
Naviera, S.A. and American International Shipping Lines, Appellees.
 No. 84-1305.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 5, 1985.
Decided June 5, 1985.
 
 Robert P. O'Brien, Baltimore, Md. (Paul B. Lang, Niles, Barton & Wilmer, Baltimore, Md., on brief), for appellant.
 Robert A. Henley, Glen Burnie, Md. (Lechowicz, Loney & Davis, Glen Burnie, Md., on brief), for appellees.
 Before WINTER, Chief Judge, and SPROUSE and WILKINSON, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 This is an action of maritime attachment and garnishment by Mare Schiffahrtskontor GmbH & Co., K.G. (Mare) against Trees Company (Trees), in which Mare seeks to garnish freight charges allegedly owed by Trees to Franco Express Lines, S.A. (Franco), the owner/operator of the oceangoing vessel M/V Ocean Haven. The complaints to which this garnishment is ancillary were filed by Mare against a variety of defendants, including Franco, in an effort to recover money allegedly due Mare for its services as a general agent for several ocean shipping lines, including Franco. These complaints have no bearing on this appeal. In this garnishment action, the basic issue is whether Trees has assets of Franco which may be garnished. Mare contends that Trees is indebted to Franco for freight charges pursuant to a contract for shipment of a cargo of logs. Trees owned the logs and contracted with Franco for their shipment from Baltimore to Antwerp on the M/V Ocean Haven. That vessel carried the logs only as far as Rotterdam, where it apparently was seized by creditors. The district court, after hearing argument and considering the pleadings and other materials, concluded sua sponte that Trees was not liable to Franco for the freight charges, on the ground that Franco failed to make delivery according to the contract, and so dismissed the garnishment. Because in our view there are genuine issues of material fact concerning the principal issue of whether Franco exercised "unreasoned judgment" in commencing and conducting the voyage and on the issue of possible unjust enrichment of either Trees or Franco, we reverse and remand for fuller development of the record.
 
 I. Facts
 
 2
 Trees contracted with Franco for the shipment of three lots of redwood logs from Baltimore to Antwerp on Franco's M/V Ocean Haven. The contract was contained in two bills of lading, both dated November 8, 1982. One covered two lots of logs and listed freight charges of $15,055.71; the other covered one lot with freight charges of $7,768.57. The freight charges in issue thus total $22,824.28. Both bills of lading stated that the freight was "prepaid" and contained the following guaranteed freight clause:
 
 
 3
 Full freight hereunder to place of delivery named herein and advance charges (including on-Carriers) shall be considered completely earned on receipt of the goods by the Carrier, whether the freight be stated or intended to be prepaid or to be collected at destination, and the Carrier shall be entitled to all freight and charges, extra compensation, demurrage, detention, general average, claims and any other payments made and liability incurred with respect to the goods, whether actually paid or not, and to receive and retain them irrevocably under all circumstances whatsoever, vessel, conveyance and/or cargo lost, damaged or otherwise or the combined transport changed, frustrated or abandoned in case of forced abandonment or interruption of the combined transport for any cause, any forwarding of the goods or any part thereof shall be at the risk and expense of the goods.
 
 
 4
 No freight was ever paid by Trees.
 
 
 5
 The logs were delivered to the Port of Baltimore and loaded onto the M/V Ocean Haven. In the course of the voyage to Antwerp, the vessel put into port in Rotterdam. The parties concede and the district court found that this was a scheduled port of call and not an "unreasonable deviation" from the planned route. Sometime in the course of its call in Rotterdam, the vessel was seized for reasons not clear in the record. The district court found that the seizure was "apparently the result of proceedings arising out of financial problems of [Franco]." The record does not reveal the sequence of events, but the district court found that at some point Franco "repudiated any intent to forward the logs to Antwerp." The logs eventually arrived in Antwerp as a result of transshipment arranged by Trees and its customers. Mare reports in its brief that the distance by road from Rotterdam to Antwerp is seventy-five miles. The record does not reveal the method of transshipment, but Trees avers that it incurred expenses of $11,574.09 in effecting the delivery to Antwerp.
 
 
 6
 Mare acts as the general agent for a number of ocean shipping lines, arranging necessary port services and often advancing sums of money to pay for such services on behalf of a vessel. Apparently Franco failed to reimburse Mare for certain advances or fees, leading Mare to file a complaint against Franco accompanied by the instant garnishment proceeding against Trees as a putative debtor of Franco. Trees filed an answer and an amended answer confessing assets of Franco of $11,250.20, consisting of freight due on the two bills of lading less the expenses for transshipment from Rotterdam to Antwerp. Trees subsequently filed another amended answer denying any assets of Franco, on the ground that no freight was owed on the bills of lading because delivery had not taken place in accordance with the contract. The district court, after hearing argument and considering Mare's process of garnishment, Tree's answers thereto, copies of the relevant bills of lading covering the logs, affidavits of Trees as to nondelivery in Antwerp, and exhibits of Trees showing transshipment costs from Rotterdam to Antwerp, sua sponte concluded that Trees was not liable to Franco for freight because of the nondelivery and entered judgment for Trees dismissing the process of garnishment.II. Unreasoned Judgment
 
 
 7
 The parties agree that under the American rule, in the absence of contractual modification, a shipper is not liable for freight for carriage of goods by sea until the goods have been delivered to the destination specified in the bill of lading which embodies the contract of carriage between the shipper and carrier. The Gracie D. Chambers, 253 Fed. 182, 183 (2d Cir.1918), aff'd sub nom. International Paper Co. v. Gracie D. Chambers, 248 U.S. 387, 39 S.Ct. 149, 63 L.Ed. 318 (1919). The parties may, however, agree to lay on the shipper the risk of the ocean voyage, by inserting in the bill of lading a guaranteed freight clause which provides that the freight is earned upon loading of the cargo onto the vessel. 253 Fed. at 183. In the instant case the passage from the two bills of lading quoted above clearly records the intent of the parties to modify the American rule to provide that Franco earned the freight upon delivery of the logs to the M/V Ocean Haven in Baltimore.
 
 
 8
 If that were the extent of this case, then plainly Mare would be entitled to prevail in its garnishment action against Trees. Even if the parties agree to insert a guaranteed freight clause into the bill of lading, however, the carrier's right to the freight is not absolute. "What the parties intend is that the carrier shall keep the freight, even if he does not deliver the cargo, unless the failure to deliver be due to the carrier's fault...." The Gracie D. Chambers, 253 Fed. at 183; The Malcolm Baxter, Jr. (Republic of France v. French Overseas Corporation), 277 U.S. 323, 332-34, 48 S.Ct. 516, 518-19, 72 L.Ed. 901 (1928); Amoco Transport Co. v. S/S Mason Lykes, 550 F.Supp. 1264, 1271 (S.D.Tex.1982). Carriers are bound, however, to exercise "reasoned judgment" in the commencement and abandonment of the voyage, that is, judgment "reasonable ... under the circumstances existing and reasonably foreseeable at the time the judgment is made." T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour, 629 F.2d 338, 376-77 (5th Cir.1980) (quoting Orient Mid-East Lines, Inc. v. Cooperative for American Relief Everywhere, Inc., 410 F.2d 1006, 1008 (D.C.Cir.1969)). Failure to exercise reasoned judgment will oust the contract of carriage, containing the guaranteed freight clause, and throw the parties back on the general American rule; that is, nondelivery deprives the carrier of the freight. The Gracie D. Chambers, 253 Fed. at 183. In appraising the reasonableness of a carrier's judgment to abandon a voyage and discharge the cargo prior to reaching the destination specified in the bill of lading, courts consider "which information was relayed to the carrier, which information it gathered, whether the carrier sought instruction from the shipper, and whether the shipper instructed the carrier." Amoco Transport Co. v. S/S Mason Lykes, 550 F.Supp. at 1270.
 
 
 9
 Unreasoned judgment sufficient to oust a guaranteed freight clause may be shown by a voluntary deviation in the planned course of the voyage, Hellenic Lines, Ltd. v. United States, 512 F.2d 1196, 1209 (2d Cir.1975), or by the unseaworthiness of the vessel that is known to the carrier and prevents the vessel from completing the voyage, The Louise, 58 F.Supp. 445, 449-50 (D.Md.1945), see The Malcolm Baxter, Jr., 277 U.S. at 331-32, 48 S.Ct. at 517-18, or by other circumstances in which the failure to deliver "be due to the carrier's fault," The Gracie D. Chambers, 253 Fed. at 183; Silva v. Bankers Commercial Corp., 163 F.2d 602, 607 (2d Cir.1947) (carrier at fault when voyage not undertaken even after cargo loaded because carrier unable "to obtain sufficient cargo and freights to render the [contracted] voyage" profitable). The issue of "unreasoned judgment" requires a factual determination subject to review on a "clearly erroneous" basis. T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour, 629 F.2d at 378-79. The parties agree and the district court found that Rotterdam was a scheduled port of call for the M/V Ocean Haven and that its stop there was not an "unreasonable deviation." Furthermore, there is nothing in the record to indicate any physical defect in the M/V Ocean Haven that rendered it unseaworthy. Trees contends, however, that Franco's failure to satisfy its creditors, which allegedly led to the seizure of the vessel in Rotterdam, was the cause of the failure to complete the voyage. Trees convinced the district court and urges us to find that Franco's commencing the voyage from Baltimore while aware of its financial instability and the consequent risk that the M/V Ocean Haven would be seized by creditors in Rotterdam constituted unreasoned judgment sufficient to oust the guaranteed freight clause and, under the American rule, relieve Trees of any liability for freight.
 
 
 10
 Although the parties have not cited and we have not discovered any federal circuit case on point, we believe that the district court correctly concluded that a carrier's commencement of a voyage in the face of financial instability that may force the termination of the voyage prior to its contractual destination could constitute "unreasoned judgment." The reasoned judgment rule is applicable in situations when "the ship's ability to make its voyage was in doubt," see T.J. Stevenson, 629 F.2d at 378, and plainly this ability may be as seriously impaired by financial weakness as by physical weakness. In Merchants Corp. of America v. 9,665 Long Tons, More or Less of No. 2 Yellow Milo, 238 F.Supp. 572 (S.D.Tex.1965), a guaranteed freight clause was ousted and the carrier denied the freight because the contracted voyage never occurred "due to the fault of the shipowner in permitting the occurrence of conditions giving rise to a libel and then in failing to preserve the financial integrity of the vessel to such an extent as to enable it to remove the libel by bond or otherwise." Id. at 574. The vessel in that case was seized by creditors prior to the commencement of the voyage, and the shipper's cargo was unloaded and transshipped by another carrier.
 
 
 11
 In an analogous context, the court in Morrisey v. SS A. & J. Faith, 252 F.Supp. 54 (N.D.Ohio 1965), held that the shipper could recover prepaid freight from the carrier on a theory of maritime tort, finding that the carrier had breached its duty to use due diligence to furnish a seaworthy vessel. The "investigation of the seaworthiness of a vessel" should not, in the court's view, be limited to "the evaluation of her physical fitness to perform the particular voyage." Id. at 58. The carrier is obliged by the warranty of seaworthiness to "make a reasonable effort to furnish a vessel which can complete the voyage for which she solicits business." Id. The court then stated:
 
 
 12
 If, when the owner lures a shipper into entrusting cargo to the care of a ship and there is a multitude of unsatisfied creditors, any one of whom can arrest the vessel, and the owner lacks the resources to free her from the arrest of process-either by satisfaction of the claims or the posting of a bond-there can be no reasonable expectation that the vessel will perform the voyage. There is, on the contrary, a strong probability that the voyage will end as did the voyage of the FAITH. If the term "seaworthiness" connotes simply a vessel fit to perform as she promises, and if the strong probability exists that her voyage will be interrupted by litigation, we hold that the vessel is unseaworthy at the start of her voyage. If the owner leaves the vessel unprotected against the foreseeable seizure by creditors she is just as liable to be stopped short of her destination as if she were left unprotected against the ordinary perils of navigation. The foreseeable result is the same: interruption or termination of the voyage.
 
 
 13
 Id. at 58-59. Although Morrisey involved an action in maritime tort, we find the same principles to be applicable in deciding whether a carrier has exercised the "unreasoned judgment" sufficient to oust a guaranteed freight clause.
 
 
 14
 In the instant case, however, the record is barren of any facts as to the specific nature of Franco's financial troubles, the reason for the seizure of the M/V Ocean Haven, and any efforts Franco may have made to forestall the seizure or rescue the vessel. At the hearing and in its memorandum order, the district court made no specific findings as to the nature or history of Franco's difficulties but referred only to its "financial instability". The transcript of the hearing reveals confusion and ultimately the failure to make any finding as to the reason for or the moving parties behind the seizure of the vessel in Rotterdam; as Mare points out in its brief, arrest of process may issue in error or for reasons unrelated to financial condition (e.g. maritime tort liability). There is no evidentiary basis in the record for the district court's conclusion that Franco was at fault in suffering the seizure of the M/V Ocean Haven.
 
 
 15
 Without such facts, it is impossible for us to conclude that Franco was aware or should have been aware that the vessel was liable to be stopped short of its contractual destination. We therefore must remand for fuller development of the record and resolution of what appear to be genuine issues of material fact on the question of Franco's judgment in dispatching the M/V Ocean Haven to Antwerp via Rotterdam in view of its allegedly unsound financial condition.
 
 III. Unjust Enrichment
 
 16
 Regardless of the district court's conclusion on the above issue, there remains the question of whether principles of unjust enrichment require that the shipping costs be apportioned among the parties rather than laid entirely upon one or the other. Mare argues that even if the guaranteed freight clause is ousted and the American rule applies, Franco still is entitled to pro rata freight for its carriage of the logs across the Atlantic Ocean to within seventy-five miles of their destination. Trees argues in turn that even if the guaranteed freight clause applies, it may still set off against its liability for freight the transshipment costs it incurred in moving the logs from Rotterdam to Antwerp. The resolution of these claims requires further factfinding and therefore must be undertaken in the first instance by the district court.
 
 
 17
 As regards the claim of Mare for pro rata freight, the American rule is generally strict: no freight is earned until delivery at the destination specified in the bill of lading. The Gracie D. Chambers, 253 Fed. 182, 183 (2d Cir.1918), aff'd sub nom. International Paper Co. v. Gracie D. Chambers, 248 U.S. 387, 39 S.Ct. 149, 63 L.Ed. 318 (1919). As that court stated in dictum, "[t]he ship may have carried the cargo on a voyage of 3,000 miles, and to within 1 mile of its destination; but the carrier has earned no freight...." 253 Fed. at 183. When a guaranteed freight clause is ousted by the carrier's unreasonable deviation, the shipper may elect to pay no freight, or to recover its transshipment costs. Hellenic Lines, Ltd. v. United States, 512 F.2d 1196, 1211-12 (2d Cir.1975).
 
 
 18
 American courts recognize, however, the maritime principle of pro rata itineris, under which a carrier is entitled to pro rata freight if the shipper voluntarily accepts delivery at an intermediate port. 512 F.2d at 1204; Richard Construction Co. v. Monongahela & Ohio Dredging Co., 407 F.2d 1170 (3rd Cir.1969) (reaching same result on unjust enrichment principles, without citing pro rata itineris ); Trans-Oceanic Peace Corp. v. India Supply Mission, 325 F.Supp. 474, 476 (S.D.N.Y.1971). The all-or-nothing rule of The Gracie D. Chambers will be modified to permit pro rata recovery only if (1) the carrier did not "deliberately abandon[ ]" the contract of carriage, and (2) the shipper "voluntarily accepted" the delivery short of the destination. Richard Construction, 407 F.2d at 1172. The incomplete development of the instant record prevents us from properly resolving these two crucial inquiries. Although the district court found that Franco "repudiated any intent to forward the logs to Antwerp," the record contains no facts as to exactly what transpired in Rotterdam. There is no indication whether Franco made any efforts to arrange forwarding of the logs or whether Trees voluntarily took control of the logs upon learning of the seizure of the M/V Ocean Haven. So that the applicability of the unjust enrichment principle of pro rata itineris may be properly evaluated, the district court should develop the relevant facts on remand.
 
 
 19
 Although we have been referred to no case directly on point and have found none, we believe that if the district court concludes that the guaranteed freight clause applies, then in order to prevent unjust enrichment of Franco and Mare, Trees may be entitled to offset its transshipment costs against the guaranteed freight due even in the absence of any "unreasoned judgment" on the part of Franco. In Richard Construction, 407 F.2d at 1173, the court in fixing the damages award to the shipper set off the pro rata freight due the carrier against, among other things, the transshipment costs incurred by the shipper. Although this specific result is flawed by the sort of double recovery by the shipper condemned in Hellenic Lines, 512 F.2d at 1211-1212, the underlying goal of preventing the unjust enrichment of either the shipper or the carrier is sound. In an analogous context, the district court in American Smelting & Refining Co. v. Naviera Andes Peruana, S.A., 208 F.Supp. 164, 169 (N.D.Cal.1962), aff'd sub nom. San Rafael Compania Naviera, S.A. v. American Smelting & Refining Co., 327 F.2d 581 (9th Cir.1964), indicated in dictum that it would permit a shipper to offset against freight owed the cost of stevedoring services rendered at discharge, which the bankrupt carrier had contracted to furnish but did not. Before permitting Trees an offset for its transshipment costs, however, the district court must develop an appropriate record and make findings as to the reasonableness of the costs incurred, Hellenic Lines, 512 F.2d at 1210, as well as the amount of the costs, which presently is established only by the affidavit of Trees.
 
 
 20
 In order that the foregoing issues of fact may be properly resolved, we remand to the district court for appropriate factfinding and application of the principles of law set out in this opinion.
 
 
 21
 REVERSED AND REMANDED.